# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| BRYAN KEITH HACKWORTH, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 4:12 CV 84 DDN ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Bryan Keith Hackworth for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq., and for supplemental security income under Title XVI of that Act, 42 U.S.C. § 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 13.) For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I. BACKGROUND

On October 28, 2009, plaintiff Bryan Keith Hackworth applied for disability insurance benefits and supplemental security income. (Tr. 130-39.) In his applications, he alleged an onset date of May 30, 2002, on account of severe headaches and pain in the arms, shoulders, back and neck. (Tr. 168.) He later amended his onset date to September 17, 2007. (Tr. 163.) His claims were denied initially on January 13, 2010, and he requested a hearing before an ALJ. (Tr. 77-84, 122.)

On September 20, 2011, following a hearing, the ALJ found that plaintiff was not disabled. (Tr. 10-17.) On December 29, 2011, the Appeals Council denied his request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL RECORD

On September 17, 2009, plaintiff went to the emergency room with complaints of pain in his left shoulder radiating down his back, chest, and arm. Plaintiff's spinal x-rays revealed C4-C5 and C5-C6 degenerative spondylosis with retrolisthesis.[1] Plaintiff's left shoulder x-rays were unremarkable. (Tr. 230, 237-38.)

On January 7, 2010, Barry Burchett, M.D., performed an internal medicine examination of plaintiff for a disability determination. His impression was that plaintiff had a large lipoma mass on the back of the neck and unexplained chest pain.[2] The lipoma mass had been removed ten years ago, but had returned. Dr. Burchett noted plaintiff's complaints of radiating shoulder pain and of his lipoma causing neck discomfort and secondary occipital headaches. (Tr. 242-45.)

On January 13, 2010, Amy Blattel performed a Physical Residual Functional Assessment of plaintiff. Blattel determined that plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for six hours in an eight-hour work day, and sit for six hours in an eight-hour work day. (Tr. 248-53.)

On July 12, 2010, plaintiff's spinal x-rays revealed mild foraminal encroachment in the C4-C5 and C5-C6 disk spaces. Plaintiff's chest x-rays were unremarkable. (Tr. 265-66.)

On July 16, 2010, plaintiff's spinal MRIs revealed degenerative changes on the C4-C5, C5-C6, and C6-C7 disk spaces. George Pjura, M.D., observed that osteophytes impressed the ventral thecal sac and ventral cord causing stenosis of the canal at C4-C5 and C5-C6.[3] (Tr. 267, 270.)

On July 29, 2010, plaintiff underwent myocardial perfusion imaging. Rajinder Gulati, M.D., found the imaging results unremarkable. (Tr. 274.)

On August 26, 2010, plaintiff underwent cardiac catheterization. The test results revealed minimal coronary luminal irregularities, but were otherwise unremarkable. (Tr. 283.)

On September 3, 2010, William F. Southworth, M.D., examined plaintiff for angina symptoms. Plaintiff complained of discomfort that began in his upper arms and moved to his shoulder and upper chest. He stated that the discomfort lasted 10 to 20 minutes and felt as though a person was standing on his chest. He also stated that the

---

[1] Spondylosis is a lesion on the spine of a degenerative nature. Stedman's Medical Dictionary, 1813 (28th ed., Lippincott Williams & Wilkins 2006) (Stedman). Retrolisthesis is the backward slippage of one vertebra onto the vertebra immediately below. http://medical-dictionary.thefreedictionary.com/enthesopathy (Last visited on September 12, 2012).

[2] Lipoma is a benign tumor of adipose tissue, composed of mature fat cells. Stedman at 1107.

[3] The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the low back. The sacrum is immediately below the lumbar vertebrae. Stedman's at 2118-19.

episodes began several months ago and were occurring more frequently. Plaintiff's medications included aspirin, Crestor, and Nitrostat.[4] (Tr. 275-76.)

On October 22, 2010, plaintiff reported to Dr. Southworth that he had experienced five episodes of discomfort since his last visit. (Tr. 318.)

On October 27, 2010, plaintiff underwent a CT scan on his chest. The CT scan revealed lingular right middle lobe and lower lobe atelectasis, a cyst, and osteophytes on the spine.[5] (Tr. 330.)

On November 24, 2010, plaintiff saw Hamid Bashir, M.D., a rheumatologist, for an evaluation. Plaintiff tested positive on an ANA test with nuclear pattern.[6] Dr. Bashir concluded that plaintiff had spinal stenosis and disc disease on the cervical spine.[7] Dr. Bashir opined that the ANA test produced a false positive. (Tr. 356-57.)

On December 7, 2010, plaintiff reported upper arm discomfort and fasciculations.[8] Dr. Southworth noted that plaintiff had impingement of the spinal cord at C5-C6 and C6-C7 and opined that his cervical radiculopathy caused his discomfort.[9] Dr. Southworth prescribed Cyclobenzaprine.[10] (Tr. 353-54.)

On December 10, 2010, Raymond Murphy, M.D., x-rayed plaintiff's lumbar spine. The x-rays revealed mild degenerative change at the L2-L3 gap. (Tr. 350.)

On January 24, 2011, plaintiff saw Kurt Eichholz, M.D., for a neurosurgical consult. Dr. Eichholz assessed plaintiff with cervical spondylosis with C4-C5, C5-C6, and C6-C7 disc osteophyte complexes and subcutaneous tissue lipoma. Dr. Eichholz stated that, before he could recommend surgery, plaintiff needed more testing. He recommended that plaintiff attempt conservative treatment and suggested physical therapy and smoking cessation. (Tr. 364-65.)

On June 13, 2011, Dr. Eichholz noted that Medicaid would not allow plaintiff to pursue physical therapy or

---

[4] Crestor is used to lower bad cholesterol and fats, and raise good cholesterol in blood. Nitrostat is used to prevent or relieve chest pain in people with heart conditions. WebMD, http://www.webmd.com/drugs (last visited on September 12, 2012).

[5] Atelectasis is a decrease or loss of air in all or part of the lung resulting in the loss of lung volume. Stedman at 173.

[6] ANA tests are used to diagnose autoimmune diseases. ANA is short for antinuclear antibodies. Mayo Clinic, http://www.mayoclinic.com/health/ana-test/MY00787 (last visited on September 12, 2012).

[7] Stenosis is the narrowing of any canal or orifice. Stedman at 1832.
[8] Fasciculations are involuntary contractions, or twitching, of groups of muscle fibers. Stedman at 704.

[9] Radiculopathy is a disorder of the spinal nerve roots. Stedman at 1622.

[10] Cyclobenzaprine is used short-term to prevent muscle spasms and to relax muscle. WebMD, http://www.webmd.com/drugs (last visited on September 12, 2012).

other conservative treatment options. Plaintiff reported that his growing lipoma caused neck pain. Dr. Eichholz recommended resection of the lipoma. (Tr. 361-62.)

On July 11, 2011, plaintiff saw Dr. Eichholz for a preoperative evaluation. Because conservative treatment was no longer an option, plaintiff was scheduled for C5-C6 and C6-C7 anterior cervical discectomy and fusion. On July 21, 2011, Dr. Eichholz performed the surgery. (Tr. 361, 376.)

On July 22, 2011, plaintiff underwent an initial evaluation for physical therapy. Later that day, he was discharged from the hospital in stable condition with instructions to lift no more than 10 pounds. (Tr. 368, 390.)

On August 29, 2011, plaintiff saw Dr. Eichholz for a follow-up examination. Plaintiff reported continuing pain in his neck and left shoulder and intermittent pain radiating to his fingers. He also reported continued headaches. Dr. Eichholz noted that plaintiff was recovering well from surgery and suggested that he consult with his primary care physician or neurologist for an evaluation of his headaches. (Tr. 403-04.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on September 13, 2011. (Tr. 22-72.) Plaintiff testified to the following. He is 49 years old. He is six feet tall and weighs 174 pounds. He has not driven since his surgery on June 21, 2011. (Tr. 26-27.)

In 2006, Plaintiff was self-employed and performed electrical work for about a year and a half. His electrical work required the full range of motion of his neck, and bending, kneeling, and stooping. In September 2007, plaintiff's arms became numb, and he became unable to pick up electrical tools. Additionally, the electric work required the use of ladders and scaffolds, which he became unable to use. Because of his neck and arm discomfort, he has not attempted to secure further work. (Tr. 31-32, 35, 57-58.)

In 2002, he worked at Wal-Mart for three or four months setting up new stores. When he worked at Wal-Mart as a stocker, his job required him to bend, kneel, and stoop. Prior to his time at Wal-Mart, plaintiff worked at the Iowa Methodist Medical Center for two years, working as a patient service associate cleaning patients' rooms. He also worked at a tire shop performing vehicle inspections for two years. He would be unable to meet the kneeling, bending, and twisting demands of his patient service and tire shop jobs. (Tr. 31-35, 56, 59.)

Plaintiff sits in various positions throughout the day. When plaintiff stands, the pain starts in his low back, goes to his shoulders and sometimes increases the severity of his headaches. His inability to stand for long periods would interfere with any of his prior jobs, which involved no sitting. (Tr. 60-61.)

On plaintiff's original onset date, May 30, 2002, a lipoma appeared when plaintiff lifted an object at work. He began to experience headaches. The pain in his hands began in March 2002, and has gradually increased in severity. (Tr. 36, 53.)

Plaintiff usually awakens at about 9:00 a.m. He makes a pot of coffee and sits in his recliner for about a half hour. Then, he stands and loosens his stiff neck and back. He is able to cook, do laundry, make his bed, vacuum, and shop with his wife. However, performing these activities causes him difficulty and discomfort. He relies on his

wife to carry groceries. (Tr. 36-38, 55.)

During the day, he usually sits around the house. Sometimes, he walks to his front porch and sits in his porch swing or walks around the yard. In the afternoon, he usually sits around the house and converses with his wife or takes phone calls. He does not go out in the evenings to see movies or eat. On weekends, he and his wife stay at home. (Tr. 39-40.)

Plaintiff watches small amounts of television, and his favorite programs are hunting programs. He does not read much, but enjoys hunting magazines and reads his mail. (Tr. 38.)

Plaintiff has friends, but he does not see them often. He describes himself as sociable. He is in a hunting club, but his only involvement is receiving magazines. (Tr. 38-39, 63.)

Plaintiff did yard work until his operation. He used a push mower. Prior to his surgery, he typically mowed his lawn in four 15-minute intervals followed by breaks lasting one or two hours. Afterwards, plaintiff took medication to relieve the pain. His yard is about 50 feet wide and 100 feet long. (Tr. 40, 62.)

He enjoys hunting and fishing, but has not hunted in two years because his back hurts when he sits in the woods. When he used to hunt, he would typically hunt for deer once a year for three days at time. He has not fished since his surgery. Sometimes, he and his wife walk their dog a half block and back. (Tr. 40-41, 63-64.)

Plaintiff quit smoking five months prior to the hearing, but he used to smoke a pack a day. He drinks only occasionally, and has had no problems with drug or alcohol abuse. He is currently taking Crestor, for cholesterol; Tramadol, for pain; Advil, for headaches; and Zolpam, to help him sleep. (Tr. 41-43.)

Plaintiff underwent the C5-C6 and C6-C7 fusion surgery because of numbness in his hands, fingers, and arms, and pain in his arms, neck, and back. The pain and numbness began four years prior to the surgery. (Tr. 43-44.)

Since his surgery, his neck has been stiff, and he has had difficulty lying down. He rates his neck pain at 6 or 7 out of 10. Tramadol reduces the pain to 4.5 out of 10. When plaintiff turns and pulls doorknobs, he experiences neck pain. Because of his lipoma, he does not have a full range of motion in his neck. As a result, he must turn his whole body in order to face someone behind or beside him. (Tr. 44-45, 49, 51.)

When plaintiff sits for any period of time, he experiences low back pain. Automobile accidents originally caused his back pain. He has not had any surgery or steroid injections to treat his back pain. (Tr. 45-46.)

Plaintiff has a headache nearly every day, which he treats with Advil and Tramadol. He rates his headache pain at 5 to 7 out of 10. Sounds can make his headaches worse. From 2002 to 2010, he did not seek medical treatment for his headaches because he had no means to pay. His headaches have grown more severe with time. In September 2007, he had headaches every day lasting from a half day to a day with the pain rated at 5 or 6 out of 10. To alleviate his headaches, he takes his medication and lies down in a dark room. (Tr. 46-47, 53-54.)

Since September 2007, plaintiff has lost strength in his upper extremities and has had difficulty using his hands to open jars and to tie shoelaces. He has difficulty opening bottles. He can zip, button, put on shoes and socks, comb his hair slowly, and open doorknobs. However, four or five years ago, he began wearing slip-on shoes and tennis shoes with Velcro straps to avoid the difficulty of tying shoelaces. (Tr. 47, 50, 55.)

Plaintiff does not suffer from depression or anxiety, but is easily distracted. After sitting for a half hour, he switches positions to alleviate his neck and back pain. He can stand 30 to 45 minutes at a time. His maximum walking distance is a block and a half because of his back pain. He can lift no more than a gallon of milk. He can bend at the waist for a maximum of one minute and struggles to reassume the standing position. When plaintiff drops an object while sitting on the couch, he waits for his wife to retrieve it. He can climb stairs. (Tr. 47-49.)

Vocational expert (VE) Barbara Myers also testified at the ALJ hearing. The ALJ asked the VE to describe plaintiff's past work. The VE responded that, according to the Dictionary of Occupational Titles, plaintiff had performed the following jobs: hand packager, which is unskilled work that requires medium strength, but was performed by plaintiff with heavy strength; construction worker, which is semi-skilled work that requires heavy strength; motor vehicle inspector, which is semi-skilled work that requires light strength; hospital cleaner, which is unskilled work that requires medium strength; and stocker, which is semi-skilled work that requires heavy strength. (Tr. 66-67.)

The ALJ presented the VE with a hypothetical question concerning an individual, who is 49 years old, with a high school education and plaintiff's past work experience. The ALJ asked the VE to assume that the individual could perform the exertional demands of sedentary work. Specifically, the individual could lift, carry, push, and pull 10 pounds occasionally and less than 10 pounds frequently; sit for six hours in an eight-hour work day; and stand or walk for two hours in the same eight-hour work day. The individual would be limited to occasionally stooping, crouching, kneeling, and crawling with no exposure to ladders, ropes, scaffolds, or unprotected heights. The individual could not have concentrated exposure to moving machinery, and would be limited to occasionally reaching overhead. The VE replied that the individual would not have transferable work skills and that those restrictions would affect the individual's performance of past relevant work. (Tr. 67-68.)

Then, the ALJ asked the VE for examples of any other jobs that the individual could perform. The VE responded with a representative list of jobs that the individual could perform, including document preparer, a job with 800 positions statewide and 30,000 nationally; circuit board assembler with 1,100 positions statewide and 65,000 nationally; and table worker with 500 positions statewide and 25,000 nationally. (Tr. 68-69.)

Additionally, the VE stated those semi-skilled jobs would not require occasional reaching overhead; would allow workers to sit or stand throughout the day; and might require lifting up to 10 pounds. The jobs do not require frequent repetitive motion for more than five to ten minutes of each hour, or kneeling, crawling, or bending. The jobs would not allow an individual to occasionally lie down to alleviate headache or other pain, or allow a worker to call in sick or be unavailable for one or two days a week. The VE also stated that document preparers prepare documents for scanning or microfilm, which requires frequent movement of both arms and hands. (Tr. 69-71.)

### III. DECISION OF THE ALJ

On September 20, 2011, the ALJ issued a decision that plaintiff was not disabled. (Tr. 10-17.) Prior to consideration of the Title XVI benefits application, the ALJ denied the Title II benefits application because plaintiff failed to show that he was disabled during the relevant time period.[11] (Tr. 11.)

Regarding plaintiff's Title XVI application, at Step One of the prescribed regulatory decision-making scheme,[12] the ALJ found that plaintiff had not engaged in substantial gainful activity since September 17, 2007. At Step Two, the ALJ found that plaintiff's impairments included status-post cervical spine fusion at C5-C6 and C6-C7 with degenerative disc disease and spondylosis, mild degenerative disc disease of the lumbosacral spine, and hyperlipidemia controlled by medication. (Tr. 16.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Id.)

The ALJ considered the record and determined that plaintiff has the residual functional capacity (RFC) to perform the physical exertional and nonexertional requirements of sedentary work except for prolonged or frequent standing or walking; lifting or carrying objects weighing more than 10 pounds; climbing ropes, ladders, or scaffolds; more than occasionally climbing ramps or stairs; more than occasionally balancing, stooping, kneeling, crouching, crawling, or reaching overhead; and concentrated or excessive exposure to unprotected heights or dangerous moving machinery. (Tr. 14, 16.)

At Step Four, the ALJ found plaintiff unable to perform any past relevant work. At Step Five, the ALJ found that plaintiff graduated from high school and was 49 years old. The ALJ also found that plaintiff had acquired, but could not perform, skills transferable to other work. Considering plaintiff's age, education, work experience, and RFC, the ALJ determined that plaintiff could perform jobs existing in significant numbers in the national economy. The ALJ concluded that plaintiff was not disabled. (Tr. 16-17.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome

---

[11] To be entitled to disability insurance benefits under Title II, a claim must prove disability for a continuous period of at least twelve months beginning on or before the last date of the last forty-quarter period during which the claimant had twenty or more quarters of coverage. 42 U.S.C. § 423(c)(1)(B). The ALJ determined that the last date was September 30, 2007. (Tr. 12.)

[12] See below for explanation.

or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues the ALJ erred in determining plaintiff's RFC by failing to consider plaintiff's headaches and speculating on plaintiff's ability to recover from surgery.

First, plaintiff argues that substantial evidence does not support the ALJ's findings concerning plaintiff's headaches. In support of his argument, plaintiff sets forth several medical records documenting his headaches and his testimony. At the ALJ hearing, he testified that he has significant headaches lasting from a half a day to a day on a daily basis and that he takes Tramadol and Advil liquid gels and lies down in a dark room to help relieve the pain.

The record contains several medical records referring to plaintiff's headaches, but most of these records briefly mention headaches as medical history. (Tr. 280, 356, 412, 417.) However, there are two exceptions. First, on January 7, 2010, Dr. Barrett noted that plaintiff complained of secondary occipital headaches caused by his neck lipoma during an internal medicine exam for disability determination. (Tr. 242.) Second, on August 29, 2011, after following up on plaintiff's spinal surgery, Dr. Eicholz noted that plaintiff continued to have headaches and suggested consulting a primary care physician or neurologist for further evaluation. (Tr. 403.)

While these medical records provide some evidence of headaches, the ALJ was correct in finding that no record reports headaches of the severity alleged by plaintiff. Additionally, no records indicate that plaintiff sought treatment for headaches. Although plaintiff testified that he never sought treatment for headaches because he had no means to pay, plaintiff sought medical attention for various other ailments on many occasions. Although Dr.

Eicholz advised plaintiff to consult his primary care physician about headaches, the record indicates that plaintiff failed to do so despite seeing his primary care physician a couple weeks later. (Tr. 411-13.) The evidence supporting plaintiff's allegations regarding the severity of his headaches consists solely of his testimony at the ALJ hearing. In sum, substantial evidence supports the ALJ's findings concerning plaintiff's headaches and their effect on the RFC determination.

Next, plaintiff argues that the ALJ should have ordered a consultative examination from a neurologist. "A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006). It is reversible error for an ALJ not to order a consultative examination when such evaluation is necessary for him to make an informed decision. Haley v. Massanari, 258 F.3d 742, 749 (8th Cir. 2001). "An ALJ is required to obtain additional medical evidence if the existing medical evidence is not a sufficient basis for a decision. But an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994).

Here, the record provides a sufficient basis for the ALJ's decision. The record includes medical test results and reports from treating and consulting physicians spanning a two-year period, where the severity of plaintiff's headaches, or even complaints thereof, could have been documented. The record also contains a transcript of the ALJ hearing, which includes plaintiff's testimony regarding the headaches. (Tr. 22-72.) Therefore, the ALJ did not err by not ordering a consultative examination.

Finally, plaintiff argues that the ALJ's statement that plaintiff would recover from surgery and be able to perform more than sedentary work was mere speculation. However, despite making this statement, the ALJ found plaintiff capable only of sedentary work. (Tr. 15-16.) As argued by the Commissioner, the statement had no bearing on the RFC determination.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.


      /S/   David D. Noce  
**UNITED STATES MAGISTRATE JUDGE**


**Signed on February 25, 2013 .**